# EXHIBIT 3

*1045517231*

STATE OF OKLAHOMA } S.S.
CLEVELAND COUNTY }

**FILED**

**IN THE DISTRICT COURT OF CLEVELAND COUNTY**
**STATE OF OKLAHOMA**

JAN 13 2020

In the office of the
Court Clerk MARILYN WILLIAMS

| | | |
|---|---|---|
| STATE OF OKLAHOMA, ex rel., | § | |
| MIKE HUNTER, | § | |
| ATTORNEY GENERAL OF OKLAHOMA, | § | |
| | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | Case No. CQ-2020-39 |
| | § | JURY TRIAL DEMANDED |
| MCKESSON CORPORATION; | § | TB |
| CARDINAL HEALTH, INC.; | § | |
| CARDINAL HEALTH 105, INC.; | § | |
| CARDINAL HEALTH 108, LLC; | § | |
| CARDINAL HEALTH 110, LLC; | § | |
| AMERISOURCEBERGEN CORP.; | § | |
| AMERISOURCEBERGEN DRUG CORP. | § | |
| | § | |
| Defendants. | § | |

**ORIGINAL PETITION**

## I.    INTRODUCTION

1.      Oklahoma is in crisis. It is a crisis that has washed over the State. A crisis that has wreaked more havoc than any oil spill or polluted stream. A crisis that rips families apart, causes people to lose their jobs, and destroys communities. A crisis that affects every aspect of life and does not discriminate amongst rich or poor, race, gender or age. The source of this crisis is the flood of prescription opioids that has inundated Oklahoma for the past two decades. It is a man-made crisis. It was brought into being by the pharmaceutical industry. The harm it has wrought, and the threat it continues to pose to the health, safety and welfare of the State, make it the worst man-made crisis Oklahoma has ever known.

2.      Opioids are highly-addictive, habit-forming drugs. They always have been. For years, the practice of narcotic conservatism protected our society from the inevitable harms that result when a large supply of opium-based drugs is introduced into a society.

3.      Defendants in this case are three major drug distributors who act as middle-men in the pharmaceutical drug supply chain. They buy opioids from manufacturers and sell them to pharmacies and others. However, the title of "middle-man" does not fully convey the size and role of these companies. Collectively, these companies supplied 34 billion opioid pills into the United States from 2006 to 2012. Defendants are collectively worth nearly $62 billion.

4.      Defendants fueled the opioid crisis by supplying massive and patently unreasonable quantities of opioids to communities throughout the United States, including Oklahoma. Defendants ignored their duties and responsibility to protect against oversupply and diversion of opioids for illicit and non-medical uses. Defendants did so for one reason: greed.

5.     As the opioid crisis grew in Oklahoma, so did Defendants' bank accounts. Not wanting to kill the golden goose (a highly addictive product), Defendants did not stop or report suspicious orders of opioids that were clearly far too large and/or not for legitimate medical uses.

6.     When it comes to opioids, history has taught one clear and simple lesson for centuries: If you oversupply, people will die. Defendants ignored this and distributed what can only be called a major oversupply of opioids into Oklahoma. As a foreseeable result, Oklahomans have suffered and died, and the State has been harmed. Defendants, in short, did not act reasonably under the circumstances and acted in reckless disregard for Oklahoma and its citizens.

7.     The State of Oklahoma seeks to recover for the damages caused by Defendants' wrongdoing. As such, the State, upon personal knowledge as to its own acts and beliefs, and upon information and belief as to all other matters, alleges as follows:

## II.     JURISDICTION AND VENUE

8.     This Court has subject-matter jurisdiction by grant of authority under Art. VII, § 7 of the Oklahoma Constitution.

9.     Further, this Court has jurisdiction over Defendants because Defendants conduct business in Cleveland County and throughout Oklahoma and have deliberately engaged in significant acts and omissions within Oklahoma that have injured the State and its citizens. Defendants purposefully directed their activities at Oklahoma and its citizens, and the claims arise out of those activities.

10.     Venue is proper in this Court under Okla. Stat. tit. 12, §137.

## III.     PARTIES

**A.     Plaintiff**

11.     The State of Oklahoma is a sovereign state of the United States. This action is

2

brought for and on behalf of the State of Oklahoma, by and through Mike Hunter, the Attorney General and chief law officer for the State and all its departments and agencies.

**B.**     **Defendants**

      i.    <u>McKesson</u>

    12.    Defendant McKesson Corporation is a corporation organized and existing under the laws of the State of Delaware with its principal place of business located in San Francisco, CA. McKesson is authorized to conduct business in Oklahoma. During all relevant times, McKesson and its DEA registrant subsidiaries and affiliates (collectively "McKesson"), distributed substantial amounts of prescription opioids to providers and retailers in Oklahoma. McKesson engaged in consensual commercial dealings with Oklahoma and its citizens and purposefully availed itself of the advantages of conducting business with and within Oklahoma. McKesson is registered in the State of Oklahoma as a foreign corporation where it may be served with process of this Court upon its registered agent, Corporation Service Company, at 10300 Greenbriar Place, Oklahoma City, Oklahoma 73159.

      ii.    <u>Cardinal</u>

    13.    Defendant Cardinal Health, Inc. is a corporation organized and existing under the laws of the State of Ohio with its principal place of business located in Dublin, Ohio. During all relevant times, Cardinal Health, Inc. and its DEA registrant subsidiaries and affiliates, including but not limited to Defendants Cardinal Health 105, Inc., Cardinal Health 108, LLC, and Cardinal Health 110, LLC (collectively "Cardinal"), distributed substantial amounts of prescription opioids to providers and retailers in Oklahoma. Cardinal engaged in consensual commercial dealings with Oklahoma and its citizens and purposefully availed itself of the advantages of conducting business with and within Oklahoma.

3

iii.   AmerisourceBergen

14.    Defendant AmerisourceBergen Corporation is a corporation organized and existing under the laws of the State of Delaware with its principal place of business located in Chesterbrook, Pennsylvania. AmerisourceBergen is authorized to conduct business in Oklahoma. During all relevant times, AmerisourceBergen and its DEA registrant subsidiaries and affiliates, including but not limited to Defendant AmerisourceBergen Drug Corp. (collectively "AmerisourceBergen"), distributed substantial amounts of prescription opioids to providers and retailers in Oklahoma. AmerisourceBergen engaged in consensual commercial dealings with Oklahoma and its citizens and purposefully availed itself of the advantages of conducting business with and within Oklahoma.

## IV.   FACTUAL ALLEGATIONS

### A.   Defendants' Conduct Contributed to the Creation of a Devastating Opioid Crisis in Oklahoma

15.    Oklahoma is suffering from a devastating opioid crisis.

16.    From 1994 to 2006, prescription opioid sales increased four-fold. From 1997 to 2013, there was a nine-fold increase in the rate of morphine milligram equivalents ("MMEs") distributed per Oklahoman for combined sales of oxycodone, hydromorphone, hydrocodone, meperidine, methadone, morphine, fentanyl and codeine.  In 2001, 5 pounds of prescription fentanyl came into Oklahoma. From 2010 to 2015, that number soared to over 19 pounds *annually*:



For the last 6 years, more fentanyl has come into Oklahoma per 100,000 people than in any other state.

17.   Over that same time, the rate of hydrocodone sales in Oklahoma has been nearly double that of the national average. According to the CDC, from 2006 through 2017, Oklahoma ranked between 4th and 8th in the nation in total opioid prescribing rates each year. In 2017, there were 479 opioid prescriptions dispensed every hour across the State. Enough opioids were prescribed that year for every adult in Oklahoma to have the equivalent of 156 ten-milligram hydrocodone tablets. Meanwhile, evidence shows that over 65% of opioids prescribed and dispensed in Oklahoma go unused and often end up being diverted.

18.   Death soon followed this oversupply of prescription opioids. Since 2000, more than 6,000 Oklahomans have lost their lives from a prescription-opioid overdose.

19.   From 1994 to 1996, six of the most common prescription drugs involved in overdose fatalities were prescription opioids including, methadone, hydrocodone, oxycodone, morphine, propoxyphene, and fentanyl. From 1994 to 2006, the number of fatal overdoses increased for all of the above-mentioned prescription opioids.

5

20.     There was a parallel increase in prescription opioid sales for each of these opioids from 1997-2006. The increase in deaths in Oklahoma paralleled the increase in prescribing of opioids and as opioid prescribing decreased starting around 2014, deaths decreased as well.

21.     From 1994 to 2006, unintentional opioid overdose rates increased seven-fold, while prescription opioid sales increased four-fold.

22.     Between 2013 and 2017, an average of 32 Oklahomans died every month from an unintentional prescription-opioid overdose. From 1994 to 1996, there was only 1 unintentional overdose involving oxycodone. From 2012 to 2014, there were 484. From 2007 to 2012, two-thirds of all children who died from an unintentional poisoning died from a prescription opioid. Since 2011, more people have died from opioids in Oklahoma than from car accidents.

23.     The trend is clear:



24.     And for every Oklahoman who died from opioids, there are countless others in their wake suffering from addiction and other devastating effects of these drugs. In 2009, for example, 45 out of every 100,000 Oklahomans had to be admitted for opioid abuse treatment. In 2017,

upwards of 500 Oklahoma babies were born suffering from the symptoms of opioid related

neonatal abstinence syndrome ("NAS"), including withdrawal symptoms:



25.     That same year, 16.4 percent of Oklahoma high school students reported misusing

prescription opioids within the past year—that is a number roughly equal to one in six.  A 2019

study showed that a child born to a parent who uses opioids for more than a year is twice as likely

to attempt suicide.

26.     As the supply of prescription opioids increased, the number of people dying from

unintentional overdose also increased:



**Figure 1.** Unintentional medication-related overdose death rates and total sales of prescription opioids by year, Oklahoma, 1994–2006

**Table 2.** Individual substances involved in unintentional medication overdose deaths: Oklahoma, 1994–2006, n (%)

| Substance | Overall[a] | 1994–1996[b] | 2004–2006[c] |
|---|---|---|---|
| Methadone | 653 (30.9) | 21 (16.0) | 377 (36.6) |
| Hydrocodone | 407 (19.3) | 9 (6.9) | 220 (21.4) |
| Alprazolam | 320 (15.2) | 8 (6.1) | 219 (21.3) |
| Oxycodone | 311 (14.7) | 1 (0.8) | 174 (16.9) |
| Morphine | 263 (12.5) | 31 (23.7) | 101 (9.8) |
| Alcohol | 260 (12.3) | 25 (19.1) | 115 (11.2) |
| Propoxyphene | 140 (6.6) | 14 (10.7) | 46 (4.5) |
| Fentanyl | 124 (5.9) | 2 (1.5) | 78 (7.6) |
| Carisoprodol | 97 (4.6) | 8 (6.1) | 40 (3.9) |
| Diazepam | 94 (4.5) | 8 (6.1) | 37 (3.6) |
| Amitriptyline | 87 (4.1) | 8 (6.1) | 33 (3.2) |
| Cocaine | 85 (4.0) | 10 (7.6) | 45 (4.4) |
| Acetaminophen | 76 (3.6) | 8 (6.1) | 33 (3.2) |
| Cyclobenzaprine | 74 (3.5) | 0 | 43 (4.2) |
| Methamphetamine | 72 (3.4) | 4 (3.1) | 43 (4.2) |
| Olanzapine | 37 (1.8) | 0 | 16 (1.6) |
| Codeine | 34 (1.6) | 2 (1.5) | 15 (1.5) |
| Other substance[d] | 609 (28.8) | 58 (44.3) | 229 (22.3) |

27.   From 2007-2012, adults aged 35-54 had the highest overdose death rates, particularly women over age 45:





28.    The accessibility and availability of prescription opioids also is fueling illicit opioid addiction. According to the CDC, past misuse of prescription opioids is the strongest risk factor for a person to start and continue using heroin. Between 2000 and 2014, overdose deaths from heroin nationwide quintupled. "According to the American Society of Addiction Medicine, four out of five people who try heroin today started with prescription painkillers."[1] As the State passes stricter legislation to combat opioid oversupply, Oklahomans addicted to prescription opioids are turning to illicit opioids such as heroin as a cheaper and more accessible alternative. From 2007 to 2012, heroin deaths in Oklahoma increased *ten-fold*. Nationally, opioid overdose deaths and heroin use have increased in lockstep with opioid sales volumes:[2]



Figure 1
Rates of OPR sales, OPR-related unintentional overdose deaths, and OPR addiction treatment admissions, 1999–2010. Abbreviation: OPR, opioid pain reliever. Source: 10.

29.    Defendants' conduct is affecting even Oklahoma's youngest and most vulnerable citizens. Oklahoma hospitals report increasing numbers of newborns testing positive for drugs or alcohol. In 2014, the number of newborns testing positive for prescription medications doubled

---

[1] Patrick Radden Keefe, *The Family That Built an Empire of Pain*, THE NEW YORKER (Oct. 30, 2017 issue) https://www.newyorker.com/magazine/2017/10/30/the-family-that-built-an-empire-of-pain.
[2] Andrew Kolodny et al., *The Prescription Opioid and Heroin Crisis: A Public Health Approach to an Epidemic of Addiction*, ANNU. REV. PUBLIC HEALTH 2015, 36:559–74, *available at* http://www.annualreviews.org/doi/pdf/10.1146/annurev-publhealth-031914-122957, at Figure 1.

from 2013. Babies born with NAS require lengthy hospital stays and intense medical treatment, dramatically increasing health care costs for the State.

30.     Each week, Oklahomans are overdosing, incarcerated, going into the foster care system, and being born addicted to opioids. This is what happens when opioids are oversupplied.

31.     Based on 2016 statistics, Oklahoma ranks number one in the nation in milligrams of opioids distributed with approximately 877 milligrams of opioids distributed per adult resident.

32.     Defendants' massive and patently unreasonable supply of opioids fueled Oklahoma's opioid crisis causing massive health care, criminal justice, foster care, NAS, and lost productivity costs, among others, from the opioid crisis.

33.     Confronted with this crisis, Oklahoma State agencies have been forced to allocate significant State resources to addressing the effects of Defendants' unlawful conduct. In 2012, Oklahoma Governor Mary Fallin, confronting "one of the most serious public health and safety threats to [the] state," commissioned a workgroup to develop a state plan with the goal to reduce opioid abuse. The initial plan was released in 2013, with the goal of reducing unintentional opioid overdose deaths in the State by 15% in five years. The plan requires coordination between health care providers, law enforcement, public health, regulatory boards, state legislature and community-based organizations.

34.     A sample of the extensive State effort expended to implement that initial plan includes, among other things:

     a.  employing a statewide media campaign that included PSAs reaching over 1.3 million Oklahomans, establishing a website, TakeasPrescribed.com, digital advertising, social-media outreach and press engagements;

     b.  developing statewide delivery of overdose prevention and community training presentations and continuing medical education programs regarding pain and opioid management;

     c.  updating the opioid prescribing guidelines and distributing and promoting the guidelines to regulatory boards, hospitals and prescribers;

      d.   developing a practice facilitation toolkit to provide onsite training and consultation services in Medicaid contracted practices;

      e.   creating 175 drop-boxes across the state for safe disposal and destruction of unused prescription opioids;

      f.   educating pharmacies, prescribers and nursing staff regarding proper medication storage and disposal;

      g.   establishing prescription drug "take-back" programs;

      h.   enhancing the State's prescription monitoring program ("PMP"); and

      i.   expanding the availability of Naloxone—an opioid-overdose antidote—for first responders and implementing Statewide over-the-counter access to Naloxone.

35.     The Oklahoma Legislature also passed legislation to form the Oklahoma Commission on Opioid Abuse to study and evaluate the epidemic and recommend changes to State policy to address it. The Commission's mission is to "study, evaluate and make recommendations for any changes to state policy, rules or statutes to better combat opioid abuse in Oklahoma."[3] The Opioid Commission conducts large-scale meetings and over the last two years, has heard, and continues to hear, from numerous medical professionals, addiction experts, law enforcement agencies, and Oklahomans whose lives and families have been negatively affected by the oversupply of opioids. The Opioid Commission issued its first Report on January 23, 2018 outlining its numerous recommendations to address the crisis. Its second report was submitted to the Oklahoma Legislature on December 31, 2019.

36.     Defendants' conduct and the resulting opioid abuse and addiction epidemic caused, and continues to cause, the State of Oklahoma, its businesses, communities and citizens to bear enormous social and economic costs including increased health care, criminal justice, and lost work productivity expenses, among others.

37.     As Oklahomans aged 35-54 have the highest death rate of any age group for prescription opioid-related overdoses, Defendants' conduct caused Oklahoma businesses,

---

[3] Initially authorized in 2017 by Senate Concurrent Resolution 12, the Oklahoma Legislature in 2019 enacted 74 O.S.Supp.2019, § 30.1 and 30.2 creating the Oklahoma Commission on Opioid Abuse.

communities, workers and families to incur substantial costs and losses of poor work performance, injuries, absenteeism, unemployment and lack of economic productivity.

38.     Defendants' conduct caused Oklahoma private insurers, businesses and consumers to pay millions of dollars for unnecessary or excessive opioid prescriptions.

39.     Defendants' conduct, including their massive and unreasonable oversupply of opioids, caused Oklahoma and its consumers to bear other substantial health care costs related to prescription opioid abuse and addiction.

40.     Defendants' conduct caused the State of Oklahoma to incur substantial costs and losses for prescription opioid-dependency-related health care costs including substance abuse treatment services, ambulatory services, inpatient hospital services and emergency department services, among others.

41.     Defendants' conduct caused Oklahoma businesses and consumers to incur substantial costs and losses for prescription opioid dependency related health care costs including substance abuse treatment services, ambulatory services, inpatient hospital services, and emergency department services, among others.

42.     Oklahomans that abuse or misuse opioids are more likely to utilize medical services, such as emergency departments, physician outpatient visits, and inpatient hospital stays.

43.     According to the CDC, every day, over 1,000 people are treated in emergency departments for misusing prescription opioids. In 2014 alone, there were 1.27 million emergency room visits or hospital inpatient stays for opioid-related issues, a 64 percent increase for inpatient care and a 99 percent jump for emergency room treatment compared from 2005.

44.     The opioid crisis also is overwhelming Oklahoma's criminal justice system. The opioid crisis costs Oklahoma millions of dollars a year on criminal justice-related costs. Oklahoma

13

spends 50 percent of its annual criminal justice system budget on substance abuse-related costs. And a 2016 CDC study reported the prescription opioid epidemic caused $7.7 billion in criminal justice-related costs borne directly by states and local government.

45.     Defendants' conduct also caused Oklahoma to expend substantial resources on education and prevention programs to combat an escalating opioid abuse crisis. The State's public education efforts include a statewide comprehensive media campaign to reduce prescription drug abuse in Oklahoma, the development and delivery of comprehensive presentations on prescription drug abuse, and funding to high-needs counties to implement community-based prescription drug abuse prevention, among other programs.

46.     The State of Oklahoma worked to provide information to the public on appropriate disposal and storage of prescription opioids. The State also initiated programs and expended significant resources to educate prescribers and dispensers of prescription opioids including working to develop an online pain management curriculum and creating and distributing opioid prescribing and dispensing guidelines.  The State also worked to educate providers on the PMP which requires dispensers of Schedule II, III, IV and V controlled substances to submit prescription dispensing information to the Oklahoma Bureau of Narcotics and Dangerous Drugs Control ("OBN") within 24 hours of dispensing a scheduled narcotic and allows prescribers to check the prescription history of their patients.  The State also developed and distributed education materials and educated providers and dispensers on proper storage and disposal of prescription opioids.

47.     Oklahoma also spent significant resources and funds to enhance its PMP and coordinate the sharing of data among state agencies.  In 2015, the Oklahoma Legislature passed a bill requiring prescribers to check the PMP the first time they prescribe opiate painkillers and two other classes of drugs and to check the PMP every 180 days thereafter.  The State also is working

14

to establish hospital emergency department discharge databases and implement public health surveillance of NAS.

48.     The State of Oklahoma would not have needed to spend substantial public resources and funding on opioid use and abuse education, prevention and intervention programs but for Defendants' massive and patently unreasonable supply of opioids in Oklahoma.

49.     The State's efforts are significant. But these efforts alone will not undo the decades of harm Defendants have inflicted on the State of Oklahoma and its citizens—harm that will continue for years to come. Oklahoma is left bearing the enormous costs of the resulting public health crisis wreaking havoc in its communities.  More must be done.

**B.      Defendants Fueled the Opioid Crisis in Oklahoma**

50.     Defendants fueled this devastating opioid crisis in Oklahoma through their reprehensible conduct in driving up the supply of highly addictive narcotics all for the sake of lining their pockets.

51.     Each Defendant distributes opioids in the State of Oklahoma.

52.     McKesson has no fewer than 18 separate distribution facilities located throughout the country that hold Oklahoma licenses as wholesale drug distribution facilities. On information and belief, McKesson has used some or all of those facilities to distribute opioids in the State of Oklahoma.

53.     Cardinal has no fewer than nine separate distribution facilities located throughout the country that hold Oklahoma licenses as wholesale drug distribution facilities. On information and belief, Cardinal has used some or all of those facilities to distribute opioids in the State of Oklahoma.

15

54.     AmerisourceBergen has no fewer than seven separate distribution facilities located throughout the country that hold Oklahoma licenses as wholesale drug distribution facilities. On information and belief, AmerisourceBergen has used some or all of those facilities to distribute opioids in the State of Oklahoma.

55.     Multiple sources impose duties on the Defendants to report suspicious orders and further to not ship those orders unless due diligence disproves those suspicions.

56.     Each Defendant has a common law duty to exercise reasonable care in delivering dangerous narcotic substances. By flooding Oklahoma generally with more opioids than could be used for legitimate medical purposes and by filling and failing to report orders that they knew or should have realized were likely being diverted for illicit and/or non-medical uses, Defendants breached that duty. In doing so, Defendants not only failed to prevent foreseeable harm, but *created* foreseeable and preventable harm to Oklahoma and its citizens.

57.     In addition, each of the Defendants assumed a duty, when speaking publicly about opioids and their efforts to combat diversion, to speak accurately and truthfully.

58.     Moreover, Oklahoma laws and regulations impose duties on Defendants and create a standard of conduct to which Defendants must adhere.

59.     These statutes and regulations were designed to protect society from the harms of drug diversion by creating a legal framework for distributing and dispensing controlled substances and monitoring and controlling them from manufacture through delivery to the patient. These statutes and regulations include Oklahoma's Uniform Controlled Dangerous Substances Act (63 O.S. Chapter 2), and numerous professional regulations related to persons who handle, prescribe, and dispense controlled substances, (collectively the "Oklahoma CSA"). The Oklahoma CSA provides strict controls and requirements throughout the opioid distribution chain.

16

60.     Defendants have a duty, and are expected, to be vigilant in deciding whether a prospective customer can be trusted to deliver controlled substances only for lawful purposes.

61.     Defendants breached this duty by failing to: (a) control the supply chain; (b) prevent diversion; (c) report suspicious orders; and (d) halt shipments of opioids in quantities they knew or should have known could not be justified and were indicative of serious oversupply of opioids.

### i.  **Defendants' Duties Under Oklahoma Law**

62.     In addition to having common law duties, the Oklahoma CSA requires distributors of controlled substances to take precautions to ensure a safe system for distribution of controlled substances, including opioids, and to prevent diversion of those controlled substances into illegitimate channels. Defendants' violation of these requirements shows that they failed to meet the relevant standard of conduct society expects from them.

63.     The Oklahoma CSA creates a legal framework for the distribution and dispensing of opioids in Oklahoma. Defendants' violation of these laws constitutes negligence.

64.     The Oklahoma CSA acts as a system of checks and balances from the manufacturing level through delivery of the pharmaceutical drug to the ultimate user. Every person or entity who manufactures, distributes, or dispenses opioids must obtain a "registration" from the Director of OBN. Registrants at every level of the prescription opioid supply chain must fulfill their obligations under the Oklahoma CSA. And participation in the opioid supply chain comes along with statutory, regulatory, and common-law duties of care. Otherwise there is great potential for harm to Oklahomans.

65.     Under the Oklahoma CSA and the Oklahoma administrative code, manufacturers and distributors must maintain effective controls against prescription opioid diversion. They must also create and use a system to identify and report suspicious orders of controlled substances to

law enforcement. OAC § 475:20-1-5. Suspicious orders include orders of unusual size, orders deviating substantially from the normal pattern, and orders of unusual frequency. *Id.* To comply with these requirements, distributors must know their customers, report suspicious orders, conduct due diligence, and terminate orders that suggest diversion.

66.     To prevent unauthorized users from obtaining opioids, Oklahoma law creates a distribution monitoring system for controlled substances. The Oklahoma CSA requires distributors and dispensers of controlled dangerous substances to keep records and maintain inventories in conformance with applicable laws and regulations.

67.     Likewise, the Oklahoma administrative code requires that distributors notify OBN of any theft or significant loss of any controlled dangerous substances. OAC § 475:20-1-5. Thefts must be reported whether or not the controlled dangerous substances are subsequently recovered and/or the responsible parties are identified, and action is taken against them. *Id.*

68.     Defendants are also required to maintain records, reports, and inventory in accordance with Oklahoma law, including by complying with opioid tracking and monitoring requirements. Defendants also have a duty to maintain effective controls against diversion of controlled substances.

69.     Again, in addition to specific regulatory obligations, distributors are also bound by common law duties to use reasonable care in conducting their business operations. And because their business is distributing highly addictive and deadly prescription drugs, distributors also have an Oklahoma common-law duty of reasonable care to, among other things, monitor for over-supply, prevent illegitimate orders from being filled, and notify appropriate authorities of suspicious behavior.

## ii.  **Distributor Defendants Understood and Acknowledged Their Duties**

70.     The reason for the reporting rules is to create a "closed" system intended to control the supply and reduce the diversion of these drugs out of legitimate channels into the illicit market, while at the same time providing the legitimate drug industry with a unified approach to narcotic and dangerous drug control. Distributors handle massive volumes of controlled substances and possess valuable knowledge of their customers and orders. As such, Defendants are uniquely positioned as the first line of defense to prevent oversupply and the movement of legal pharmaceutical controlled substances from legitimate channels into the illicit market.

71.     Distributors' obligation to maintain effective controls to prevent diversion and to monitor the supply of controlled substances is critical. Should a distributor deviate from these checks and balances, the closed system of distribution collapses. Defendants were well aware they had an important role to play in the State's system, and also knew or should have known that their failure to comply with their obligations under state law would have serious consequences for Oklahoma and its citizens.

72.     Trade organizations to which Defendants belong have acknowledged that wholesale distributors have been responsible for reporting suspicious orders for more than 40 years. The Healthcare Distribution Management Association ("HDMA," now known as the Healthcare Distribution Alliance ("HDA")) has long taken the position that distributors have responsibilities to "prevent diversion of controlled prescription drugs" not only because they have statutory and regulatory obligations to do so, but "as responsible members of society."[4]

73.     Guidelines established by the HDA also explain that distributors, "[a]t the center of a sophisticated supply chain . . . are uniquely situated to perform due diligence in order to help

---

[4] *See Infra* at n. 15.

support the security of the controlled substances they deliver to their customers."[5]  In other words, under the circumstances, it is required by the standard of ordinary and reasonable care for distributors like Defendants to perform such due diligence and exercise safeguards.   And Defendants knew it.

### iii.  Defendants Carefully Tracked Distribution and Prescription Data and Knew About Suspicious Orders and Prescribers.

74.   Defendants were required to track distribution data and prescription data.  As such, though they did not disclose it to the public, Defendants were aware of suspicious orders and the dramatic increase of opioids entering Oklahoma's borders. That is, Defendants were acutely aware of the oversupply.  Alternatively, to the extent Defendants failed to properly monitor and track prescription data and/or distribution data, such failures constitute reckless disregard and gross negligence.

75.   Defendants funneled far more opioids into communities across the United States, including Oklahoma, than could have been expected to serve legitimate medical use. They ignored other red flags of suspicious orders. This information, along with the information known and/or knowable only to Defendants and their business partners, would have alerted them to potentially suspicious orders of opioids.

76.   This information includes the following facts:

   a. Distributors regularly visit pharmacies and doctors to promote and provide their products and services, which allows them to observe red flags of oversupply and diversion; and

---

[5] Healthcare Distribution Management Association (HDMA) Industry Compliance Guidelines: Reporting Suspicious Orders and Preventing Diversion of Controlled Substances, filed in *Cardinal Health, Inc. v. Holder*, No. 12-5061 (D.C. Cir. Mar. 7, 2012), Doc. No. 1362415 (App'x B at 1).

b. Defendants together account for approximately 90% of all revenues from prescription drug distribution in the United States[6], and each plays such a large part in the distribution of opioids that its own volume provides a ready vehicle for measuring the overall flow of opioids into a pharmacy or geographic area.

77.     The conclusion that Defendants were on notice of the problems of abuse and diversion follows inescapably from the fact that they flooded communities with opioids in quantities that they knew or should have known exceeded any legitimate market for opioids.

78.     At all relevant times, Defendants were in possession of national, regional, state, and local prescriber- and patient-level data that allowed them to track prescribing patterns over time. They obtained this information from data companies, including but not limited to: IMS Health, QuintilesIMS, IQVIA, Pharmaceutical Data Services, Source Healthcare Analytics, NDS Health Information Services, Verispan, Quintiles, SDI Health, ArcLight, Scriptline, Wolters Kluwer, and/or PRA Health Science, and all of their predecessors or successors in interest (the "Data Vendors").

### iv.  **Prior Regulatory Actions Against Distributor Defendants for Failing to Prevent Diversion**

79.     As discussed above, Defendants failed to report suspicious orders, prevent diversion, or otherwise control the supply of opioids flowing into communities across America. Despite the notice described above, and in disregard of their duties, Defendants continued to pump massive quantities of opioids into the Oklahoma supply chain despite their obligations to control the supply, prevent diversion, report and take steps to halt suspicious orders.

---

[6] *2018 MDM Market Leaders, Top Pharmaceutical Distributors*, Fein, Adam J., Ph.D. https://www.mdm.com/2017-top-pharmaceuticals-distributors.

80.     Despite knowing the risks of oversupply and diversion and their broad assurances to regulators, states, and the public, Defendants have recklessly or negligently allowed oversupply and diversion in Oklahoma. Their misconduct has resulted in numerous civil fines and other penalties recovered by government agencies.

v. **Distributor Defendants Violated Their Duties in Oklahoma**

81.     Despite being repeatedly penalized by law enforcement authorities, Defendants have not changed their conduct. Defendants have engaged in a consistent, nationwide pattern and practice of illegally distributing opioids. That pattern and practice has also affected the State of Oklahoma and its citizens.

82.     In fact, Defendants have supplied and continue to supply quantities of prescription opioids in and around Oklahoma with the actual or constructive knowledge that the opioids were ultimately being consumed by Oklahoma citizens for illicit and/or non-medical purposes. Many of these shipments should have been stopped or investigated as suspicious orders, but Defendants negligently or recklessly failed to do so.

83.     From 2006-2012, there were over 1.4 billion opioid pills distributed in the State of Oklahoma. Defendants were responsible for distributing over 585 million, or 42%, of those pills.[7]

84.     During this same time period, the rate of Oklahomans dying from unintentional prescription drug-related overdoses was at all-time highs. *See, e.g., supra* ¶20.

85.     Each Defendant knew, or should have known, that the amount of opioids that it allowed to flow into Oklahoma was far in excess of what could be consumed for medically-

___

[7] *Drilling into the DEA's Pain Pill Database*, The Washington Post, https://www.washingtonpost.com/graphics/2019/investigations/dea-pain-pill-database/ (last accessed 1/9/2020).

necessary purposes in the relevant communities (especially given that each Defendant knew it was not the only opioid distributor servicing those communities).

86.     Defendants negligently or recklessly failed to control their supply lines to prevent diversion. A reasonably-prudent distributor of controlled substances would have anticipated the danger of opioid oversupply and diversion and protected against it by, for example (a) taking greater care in hiring, training, and supervising employees; (b) providing greater oversight, security, and control of supply channels; (c) looking more closely at the pharmacists and doctors who were purchasing large quantities of commonly-abused opioids in amounts much greater than appropriate, given the size of the local populations; (d) investigating demographic or epidemiological facts concerning the increasing demand for narcotic painkillers in and around Oklahoma; (e) informing pharmacies and retailers about opioid diversion; and (f) in general, simply following applicable statutes, regulations, professional standards, and guidance from government agencies.

87.     Under Oklahoma law, distributors have a duty to detect, investigate, refuse to fill, and report suspicious orders of opioids. To that end, the OBN requires that drug distributors "shall keep records and maintain inventories in conformance with the record-keeping and inventory requirements of federal law and with the additional rules the Director issues." 63 O.S. § 2-307.

88.     As mentioned above, Oklahoma regulations further mandate that suspicious orders, defined as unusual in size or frequency or deviation from buying patterns, be reported to OBN. OAC § 475:20-1-5. "The registrant shall inform the OBN of suspicious orders when discovered by the registrant. Suspicious orders include orders of unusual size, orders deviating substantially from a normal pattern, and orders of unusual frequency." *Id.* Any of the red flags identified by law trigger a duty to report, but this list is not exhaustive. Other factors -- such as whether the order is

23

skewed toward high dose pills, or orders that are skewed towards drugs valued for abuse, rather than other high- volume drugs, such as cholesterol medicines -- also should alert distributors to potential problems.

89.     Distributors also have a duty to know their customers and the communities they serve. To the extent that, through this process of customer due diligence, a distributor observes suspicious circumstances—such as cash transactions or young and seemingly healthy patients filling prescriptions for opioids at a pharmacy they supply—those observations can also trigger reasonable suspicion. A single order can warrant scrutiny, or it may be a pattern of orders, or an order that is unusual given the customer's history or its comparison to other customers in the area.

90.     Given this, and the additional red flags described below, Defendants should have been on notice that oversupply and diversion of opioids was likely occurring in Oklahoma communities, and that they should have investigated, ceased filling orders for opioids, and/or reported potential diversion to law enforcement. Anything other than the "do nothing and keep making money" approach they chose.

91.     Publicly available ARCOS data suggests distribution of opioids in Oklahoma communities exceeded reasonable supply for appropriate medical use and that opioids were likely diverted in these areas. For example, from 2006 to 2012[8], there were:

    a.  304,336,268 prescription pain pills, enough for 61 pills per person per year, supplied to Oklahoma County, Oklahoma. 66,490,430 of those pills were distributed by McKesson; 20,033,680 were distributed by Cardinal; and 18,651,970 were distributed by AmerisourceBergen.

---

[8] *Drilling into the DEA's Pain Pill Database*, The Washington Post, https://www.washingtonpost.com/graphics/2019/investigations/dea-pain-pill-database/ (last accessed 1/9/2020).

b. 275,213,174 prescription pain pills, enough for 61 pills per person per year, supplied to Tulsa County, Oklahoma. 50,842,380 of those pills were distributed by McKesson; 18,987,919 were distributed by Cardinal; and 12,763,420 were distributed by AmerisourceBergen

c. 70,479, 231 prescription pain pills, enough for 41 pills per person per year, supplied to Cleveland County, Oklahoma. 12,874,135 of those pills were distributed by McKesson; 8,446,111 were distributed by Cardinal; and 1,132,630 were distributed by AmerisourceBergen.

d. 26,097,120 prescription pain pills, enough for 84 pills per person per year, supplied to Stephens County, Oklahoma. 13,896,620 were distributed by McKesson.

e. 28,818,070 prescription pain pills, enough for 58 pills per person per year, supplied to Muskogee County, Oklahoma. 9,225,270 of the pills were distributed by AmerisourceBergen.

f. 5,760,860 prescription pain pills, enough for 65 pills per person per year, supplied to Haskell County, Oklahoma. 2,250,700 of the pills were distributed by AmerisourceBergen Drug.

g. 28,302,170 prescription pain pills, enough for 58 pills per person per year, supplied to Creek County, Oklahoma. 5,078,610 of the pills were distributed by Cardinal Health.

h. 12,715,550 prescription pain pills, enough for 83 pills per person per year, supplied to Beckham County, Oklahoma. 3,626,720 were distributed by Cardinal Health.

25

    i.    20,633,210 prescription pain pills, enough for 72 pills per person per year, supplied to Mayes County, Oklahoma. 5,061,860 of the pills were distributed by Cardinal Health.

    j.    4,142,230 prescription pain pills, enough for 92 pills per person per year, supplied to Jefferson County, Oklahoma. 4,073,440 (98%) of the pills were distributed by Defendants.

    k.    During the same time, across the United States the equivalent of 28 pills per person were distributed in 2006 and 40 pills per person in 2012.

92.    The foregoing figures support the inference that there was a greater distribution of opioids than could be justified by legitimate medical need. The volume of opioids distributed in Oklahoma communities, including, but not limited to those described above, was so high as to raise a red flag that not all of the prescriptions being ordered could be for legitimate medical uses.

93.    Further, prescribers and pharmacists in Oklahoma have been convicted of crimes involving drug diversion. Upon information and belief, these prescribers, and the pharmacies at which their patients filled prescriptions for opioids, yielded orders of unusual size, frequency, or deviation, or raised other warning signs that should have alerted Defendants not only to an overall oversupply in the State, but specific instances of diversion.

94.    In addition, the increase in fatal overdoses from prescription opioids has been widely publicized for years. Oklahoma, in particular, has faced a spike in fatal drug overdoses, the majority of which are attributable to the illicit opioids that patients often began abusing after becoming addicted to prescription opioids. The CDC estimates that for every opioid-related death, there are 733 non-medical users. Defendants thus had every reason to believe that illegal diversion was occurring in the State of Oklahoma.

95.     Based upon all of these red flags, it can be fairly inferred that Defendants had information about suspicious orders that they did not report, and also failed to exercise due diligence before filling orders from which drugs were diverted into illicit uses in communities across Oklahoma.

96.     Defendants disregarded their reporting and due diligence obligations under Oklahoma law. They consistently failed to report or suspend illicit orders, deepening the crisis of opioid abuse, addiction, and death in Oklahoma.

vi.  **Defendants' Conduct Has Injured and Continues to Injure Oklahomans**

97.     As discussed above, the impact of the opioid epidemic on Oklahoma has been catastrophic. *Supra* at ¶¶ 14 - 47.

98.     It was reasonably foreseeable to Defendants that their violations of their duties under Oklahoma laws and regulations would allow name-brand and generic prescription opioids to be oversupplied and diverted.

99.     It was reasonably foreseeable to Defendants that their failure to prevent oversupply and diversion would cause injuries, including addiction, overdoses, and death. It was also reasonably foreseeable that many of these injuries would be suffered by the State of Oklahoma and its citizens, and that the costs of these injuries would be shouldered by the State of Oklahoma.

100.    Defendants knew or should have known that the opioids they were oversupplying, and which were being diverted from their supply chains, would contribute to the state's opioid crisis, and would create access to opioids by unauthorized users, which, in turn, would perpetuate the cycle of addiction, demand, and illegal transactions.

101.    Defendants knew or should have known that a substantial amount of the opioids dispensed in and around the State of Oklahoma were being dispensed based on invalid or

suspicious prescriptions. Yet, Defendants continued to oversupply. It was foreseeable that filling suspicious orders for opioids and continuing to oversupply them would harm the State of Oklahoma and its citizens.

102.    Defendants knew of widespread prescription opioid abuse in and around the State of Oklahoma, but nevertheless persisted in a pattern of distributing commonly abused and diverted opioids in places—and in such quantities, and with such frequency—that they knew or should have known these opioids were being over-prescribed and consumed for inappropriate purposes.

103.    The use of opioids by Oklahomans who were addicted or who did not have a medically appropriate purpose for using opioids could not have occurred without the actions of Defendants. Due to the oversupply, opioids were and still are far too available in Oklahoma, leading to deadly outcomes, including consumption by unknowing children and teens. If Defendants had monitored supply and guarded against diversion as required by Oklahoma law, the State and its citizens would have avoided significant injury.

104.    Defendants profited substantially from the illegal oversupply and diversion of prescription opioids in the State of Oklahoma. Defendants knew or should have known that the State would be unjustly forced to bear the costs of these injuries.

105.    Defendants' distribution of excessive amounts of prescription opioids in the State of Oklahoma showed a reckless disregard for the safety of the State and its citizens. Defendants' conduct poses a continuing threat to the health, safety, and welfare of the State and its citizens.

106.    At all relevant times, Defendants engaged in these activities, and continue to do so, knowing that the State, in its role of providing protection and care for its citizens, would incur additional costs to its healthcare, criminal justice, social services, welfare, and education systems, and would also have to bear the loss of substantial economic productivity and tax revenue.

107.    It was reasonably foreseeable to Defendants that the State of Oklahoma would be forced to bear substantial expenses as a result of Defendants' acts.

108.    The conduct of Defendants, their agents, and their employees was, at the very least, negligent.

**C.    Defendants Concealed the Truth About Their Conduct**

109.    When a distributor does not report or stop excessive and suspicious orders, prescriptions for controlled substances may be written and dispensed to individuals who abuse them or who sell them to others to abuse. This, in turn, fuels and expands the illegal market and results in opioid-related addiction and overdoses. Without reporting by those involved in the supply chain, law enforcement may be delayed in taking action – or may not know to take action at all.

110.    After being caught for failing to comply with particular obligations at particular facilities, Defendants made broad promises to change their ways and insisted that they sought to be good corporate citizens. More generally, the Defendants publicly portrayed themselves as committed to working with law enforcement, opioid manufacturers, and others to prevent diversion of these dangerous drugs. For example, Defendant Cardinal claims that: "We challenge ourselves to best utilize our assets, expertise and influence to make our communities stronger and our world more sustainable, while governing our activities as a good corporate citizen in compliance with all regulatory requirements and with a belief that doing 'the right thing' serves everyone."

111.    Defendant Cardinal likewise claims to "lead [its] industry in anti- diversion strategies to help prevent opioids from being diverted for misuse or abuse." Along the same lines, it claims to "maintain a sophisticated, state-of-the-art program to identify, block and report to

29

regulators those orders of prescription-controlled medications that do not meet [its] strict criteria." Defendant Cardinal also promotes funding it provides for "Generation Rx," which funds grants related to prescription drug misuse. A Cardinal executive recently claimed that Cardinal uses "advanced analytics" to monitor its supply chain; Cardinal assured the public it was being "as effective and efficient as possible in constantly monitoring, identifying, and eliminating any outside criminal activity."

112. Along the same lines, Defendant McKesson publicly claims that its "customized analytics solutions track pharmaceutical product storage, handling and dispensing in real time at every step of the supply chain process," creating the impression that McKesson uses this tracking to help prevent oversupply and diversion. Defendant McKesson has also publicly stated that it has a "best-in- class controlled substance monitoring program to help identify suspicious orders," and claimed it is "deeply passionate about curbing the opioid epidemic in our country."

113. Defendant AmerisourceBergen, too, has taken the public position that it is "work[ing] diligently to combat diversion and [is] working closely with regulatory agencies and other partners in pharmaceutical and healthcare delivery to help find solutions that will support appropriate access while limiting misuse of controlled substances." A company spokeswoman also provided assurance that: "At AmerisourceBergen, we are committed to the safe and efficient delivery of controlled substances to meet the medical needs of patients."

114. Moreover, in furtherance of their effort to affirmatively conceal their conduct and avoid detection, the Defendants, through their trade associations, HDMA and the National

Association of Chain Drug Stores ("NACDS"), filed an amicus brief in *Masters Pharmaceuticals*, which made the following statements:[9]

      a.  "HDMA and NACDS members not only have statutory and regulatory responsibilities to guard against diversion of controlled prescription drugs, but undertake such efforts as responsible members of society."

      b.  "Distributors take seriously their duty to report suspicious orders, utilizing both computer algorithms and human review to detect suspicious orders based on the generalized information that is available to them in the ordering process."

115.    Through the above statements made on their behalf by their trade associations, and other similar statements assuring their continued compliance with their legal obligations, the Defendants not only acknowledged that they understood their obligations under the law, but they further affirmed that their conduct was in compliance with those obligations.

116.    Public statements by the Defendants and their associates created the false and misleading impression to regulators, prescribers, and the public that the Defendants rigorously carried out their legal duties, including their duty to report suspicious orders and exercise due diligence to prevent diversion of these dangerous drugs, and further created the false impression that these Defendants also worked voluntarily to prevent diversion as a matter of corporate responsibility to the communities their business practices would necessarily impact.

## V.    CAUSES OF ACTION

### A.   Negligence

117.    The allegations set forth above are incorporated by reference herein.

---

[9] Brief for HDMA and NACDS, *Masters Pharms., Inc. v. U.S. Drug Enf't Admin.*, Case No 15-1335, 2016 WL 1321983, (D.C. Cir. April 4, 2016) at *3-4, *25, a lawsuit wherein Masters Pharmaceuticals challenged the DEA's decision to revoke the company's certificate of registration, without which it could not sell controlled substances.

118.    The State brings these claims on behalf of itself against Defendants for their failure to exercise ordinary and reasonable care.

119.    At all times relevant hereto, Defendants had a duty to act reasonably under the circumstances and owed such duties to Plaintiff. Defendants had a duty to act reasonably in, among other things: monitoring and/or reporting suspicious orders of opioids; guarding against diversion of opioids; training their employees related to the distribution of opioids; supplying the market of opioids; and providing effective controls and procedures for guarding against theft and diversion.

120.    Defendants negligently and carelessly fell below the standard of care and failed to act reasonably. Defendants' negligent acts include, among other things: failing to monitor and/or report suspicious orders of opioids; failing to guard against diversion of opioids; failing to reasonably and properly train their employees related to the distribution of opioids; supplying the market of opioids in an unreasonable and unsafe way; and failing to provide effective controls and procedures for guarding against theft and diversion.

121.    Despite their knowledge of the dangers of opioids and the substantial likelihood that sales in such volumes were for abuse, non-medical use, and/or being diverted, Defendants continued to supply the opioid market and sell opioids into the supply chain.

122.    Defendants breached their duty to exercise the reasonable care and prudence appropriate when selling and distributing opioids, which are highly dangerous and addictive narcotics.

123.    Defendants knew or should have known that Oklahoma would foreseeably suffer injury as a result of Defendants' failure to exercise ordinary care as described above.

32

124.    As a direct and proximate result of the negligence of Defendants, the State suffers and continues to suffer from the injuries and damages set forth in this Petition. The direct, proximate and foreseeable harm Defendants caused to the State is demonstrated in the below non-exhaustive statistics:

- Drug overdose deaths in Oklahoma increased eightfold from 1999 to 2012, surpassing car crash deaths in 2009;

- Since 2000, more than 6,000 Oklahomans have lost their lives from a prescription-opioid overdose;

- From 1994 to 2006, unintentional opioid overdose rates increased seven-fold, while prescription opioid sales increased four-fold;

- In 2012, Oklahoma had the fifth-highest unintentional poisoning death rate and prescription opioids contributed to the majority of those deaths;

- Between 2013 and 2017, an average of 32 Oklahomans died every month from an unintentional prescription-opioid overdose;

- In 2014, Oklahoma's unintentional poisoning rate was 107% higher than the national rate;

- In 2016, Oklahoma ranked number one in the nation in milligrams of opioids distributed with approximately 877 milligrams of opioids distributed per adult resident;

- For the last 6 years, more fentanyl has come into Oklahoma per 100,000 people than in any other state. From 2010 to 2015, over 19 pounds of fentanyl came into Oklahoma *annually*;

33

- Oklahoma leads the nation in non-medical use of painkillers, with nearly 5% of the population aged 12 and older abusing or misusing painkillers;

- From 2006 through 2017, Oklahoma ranked between 4th and 8th in the nation in total opioid prescribing rates each year;

- In 2017, there were 479 opioid prescriptions dispensed every hour across the State—enough for every adult in Oklahoma to have the equivalent of 156 ten-milligram hydrocodone tablets;

- Prescription opioid addiction often leads to illicit opioid use and addiction;

- According to the CDC, past misuse of prescription opioids is the strongest risk factor for heroin initiation and use;

- From 2007 to 2012, the number of heroin deaths in Oklahoma increased tenfold;

- In 2009, forty-five out of every 100,000 Oklahomans had to be admitted for opioid abuse treatment;

- Oklahoma hospitals are reporting an increasing number of newborns testing positive for prescription medications. For example, in 2017, upwards of 500 Oklahoma babies were born suffering from the symptoms of opioid related neonatal abstinence syndrome ("NAS"), including withdrawal symptoms;

- In 2017, roughly one in six—or 16.4 percent—of Oklahoma high school students reported misusing prescription opioids within the past year; and

- Defendants' massive and unreasonable distribution of opioids and the resulting opioid abuse and addiction epidemic caused the State of Oklahoma, its businesses, communities and citizens to bear enormous social and economic costs including

increased health care, criminal justice, and lost work productivity expenses, among others.

125.    Defendants' conduct was willful and/or in reckless disregard to the rights of the State. As such, the State seeks an award of punitive damages against each Defendant.

**B.    Unjust Enrichment**

126.    Due to Defendants' conduct as described herein, Defendants were unjustly enriched at the expense of the State.

127.    For years, Defendants have peddled their opioids while knowing full well that they were being abused and sold for non-medical use and, in doing so, have siphoned millions of dollars from the State's coffers into their corporate bank accounts. While many Oklahomans' lives are ravaged by opioid abuse and addiction, Defendants have lined their pockets with State monies paid for opioids and other related medical services and products that, but for Defendants' above-described conduct, would never have been sold.

128.    The State is entitled to recover Defendants' ill-gotten gains.

129.    The Court should impose a constructive trust under the doctrine of unjust enrichment.

## VI.    DISAVOWAL OF FEDERAL CLAIMS

130.    For the sake of clarity, and in the event any Defendant seeks to remove this case and/or claims that any federal claim or question is raised by this Petition or any other paper, the State hereby expressly disavows any such federal claim or question as being a part of this lawsuit.

## VII.    JURY DEMAND

131.    The State requests a trial by jury on all issues so triable.

35

## VIII.  PRAYER

WHEREFORE, Plaintiff prays for relief and judgment as follows:

A.   Award the State of Oklahoma compensatory damages for the increased costs to Oklahoma's healthcare, criminal justice, social services, welfare, and education systems, as well as the cost of lost productivity and lower tax revenue due to Defendants' negligence;

B.   Award the State of Oklahoma restitution of its costs caused by Defendants' action, including the costs of addressing Defendants' externalities and the costs of prescription opioids paid for by the State;

C.   Disgorge Defendants of all amounts they have unjustly obtained;

D.   Reasonable expenses and investigation fees, including attorney's fees;

E.   Punitive damages;

F.   All other relief to which the State is entitled.

Dated:  January 13, 2020

Mike Hunter, OBA No. 4503
ATTORNEY GENERAL FOR
  THE STATE OF OKLAHOMA
Abby Dillsaver, OBA No. 20675
GENERAL COUNSEL TO
  THE ATTORNEY GENERAL
Ethan A. Shaner, OBA No. 30916
DEPUTY GENERAL COUNSEL
313 N.E. 21st Street
Oklahoma City, OK 73105
Telephone:    (405) 521-3921
Facsimile:    (405) 521-6246
Emails:        abby.dillsaver@oag.ok.gov
               ethan.shaner@oag.ok.gov

Michael Burrage, OBA No. 1350
Reggie Whitten, OBA No. 9576
Randa Reeves, OBA No. 30695
WHITTEN BURRAGE
512 N. Broadway Avenue, Suite 300
Oklahoma City, OK 73102
Telephone:    (405) 516-7800
Facsimile:    (405) 516-7859

36

Emails:      mburrage@whittenburragelaw.com
                 rwhitten@whittenburragelaw.com
                 rreeves@whittenburragelaw.com

Bradley E. Beckworth, OBA No. 19982
Jeffrey J. Angelovich, OBA No. 19981
Lisa Baldwin, OBA No. 32947
Trey Duck, OBA No. 33347
Drew Pate, *pro hac vice*
Brooke A. Churchman, OBA No. 31964
Nathan B. Hall, OBA No. 32790
Ross Leonoudakis, *pro hac vice*
Robert Winn Cutler, *pro hac vice*
NIX, PATTERSON, LLP
512 N. Broadway Avenue, Suite 200
Oklahoma City, OK 73102
Telephone:    (405) 516-7800
Facsimile:    (405) 516-7859
Emails:       bbeckworth@nixlaw.com
                jangelovich@nixlaw.com
                lbaldwin@nixlaw.com
                tduck@nixlaw.com
                dpate@nixlaw.com
                bchurchman@nixlaw.com
                nhall@nixlaw.com
                rossl@nixlaw.com
                winncutler@nixlaw.com

**ATTORNEYS FOR PLAINTIFF**

37